IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DAVID ALLEN McCARTT,
　　　　Plaintiff,

vs.　　　　　　　　　　　　　　　　　　Case No.: 3:11cv217/EMT

MICHAEL ASTRUE,
Commissioner of the
Social Security Administration,
　　　　Defendant.
_____/

**MEMORANDUM DECISION AND ORDER**

　　　　This case, in which Plaintiff proceeds pro se and in forma pauperis, has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 29, 31).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

　　　　Upon review, this court concludes that the findings of fact and determinations of the Commissioner are supported by substantial evidence and comport with proper legal principles.  The decision of the Commissioner therefore shall be affirmed pursuant to sentence four of § 405(g).  In addition, the court treats Plaintiff's requests to file additional evidence as motions to remand pursuant to sentence six of  § 405(g) (docs. 35, 43, 44, 45), which motions the court denies.

I.      PROCEDURAL HISTORY

On November 20, 2008, Plaintiff filed an application for SSI, alleging disability beginning September 24, 2008 (tr. 13).[1]  Plaintiff's application was denied initially and on reconsideration.  On Plaintiff's request, an administrative law judge ("ALJ") conducted a hearing on July 13, 2010, at which Plaintiff represented himself.  The ALJ heard testimony from Plaintiff and a vocational expert ("VE").  On September 24, 2010, the ALJ issued a decision in which he found Plaintiff had not been disabled, as defined under the Act, at any time through the date of the decision (tr. 13–21).  The Appeals Council ("AC"), after considering Plaintiff's reasons for disagreeing with the ALJ's decision and the additional evidence he had submitted, denied Plaintiff's request for review on April 14, 2011 (*see* tr. 1).  The decision of the ALJ thus stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.     FINDINGS OF THE ALJ

In his decision dated September 24, 2010, the ALJ made the following findings (*see* tr. 13–21):

(1)      Plaintiff has not engaged in substantial gainful activity since November 20, 2008, the date he filed his SSI application.

(2)      Plaintiff has the following severe impairments: obstructive sleep apnea; chronic obstructive pulmonary disorder ("COPD"); asthma; past history of seizures; diffuse degenerative disc disease of the lumbar spine; and degenerative joint disease of the left knee.

(3)      Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment.

---

[1]  All references to "tr." refer to the transcript of Social Security Administration ("SSA") record filed on November 22, 2011 (doc. 28).  Also, except where the reference is to a specific document that appears on the docket, page numbers refer to those found on the lower right-hand corner of each page of the transcript, as assigned by the SSA rather than by the court's electronic docketing system or by any other system or entity.

(4)     Plaintiff has the residual functional capacity ("RFC") to perform light work,[2] except he can lift and carry twenty pounds occasionally and ten pounds frequently.  Plaintiff can sit, stand, and walk for six hours each while taking normal breaks during an eight-hour workday.  His ability to push and pull is unlimited.  Plaintiff may never climb ladders, ropes and scaffolds but he may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  Plaintiff may never identify and distinguish items requiring color vision.  He should avoid extreme heat, extreme cold, wetness, humidity, vibration, pulmonary irritants, and hazards.

(5)     Plaintiff is capable of performing his past relevant work as a tax preparer, SVP [Specific Vocational Preparation] 4, sedentary, which work does not require the performance of work-related activities precluded by Plaintiff's RFC.

(6)     Plaintiff has not been under a disability, as defined in the Act, since November 20, 2008, the date he filed his SSI application.

III.    STANDARD OF REVIEW

        Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214

---

[2]  Light work is defined in § 416.967(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

(11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks disability insurance benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision.  The same applies to any citations of statutes or regulations found in quoted court decisions.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.      Personal and Employment History

Plaintiff was born on September 18, 1959, and thus was forty-nine years of age on his alleged disability onset date of September 24, 2008 (tr. 52).  At the July 13, 2010, hearing Plaintiff testified he weighed 262 pounds, down from 318 pounds in January 2010, and his height was 5'7" (tr. 57–58).  According to Plaintiff, he lost weight pursuant to his physician's instructions as preparation to undergoing surgery on his left knee and back (tr. 58).  Plaintiff further testified that he has a two-year college diploma in accounting and business administration and past relevant work as a shuttle driver, professional wrestler, grocery store clerk, fast food worker, security guard, and income tax preparer (see tr. 17, 52–53, 62–64, and 75).  Plaintiff stated that after he successfully underwent surgery and rehabilitation for his knee and back problems he hoped to work as a self-employed shuttle driver (tr. 65).

B.      Relevant Medical History

Before briefly outlining Plaintiff's medical history the court addresses the manner in which Plaintiff responded in his memorandum to the court's November 28, 2011, Scheduling Order (doc. 30).  As stated above, Plaintiff proceeds pro se in this case, which status the court recognized in the Scheduling Order.  Although the court advised Plaintiff in the Scheduling Order that it must construe his pro se filings liberally and hold them to a less stringent standard than those drafted by attorneys, it also cautioned him that the court was not required to rewrite deficient pro se filings and that pro se litigants are required to follow all procedural rules (*id.*).  The court also directed Plaintiff, indeed instructed him emphatically, that his memorandum in support of the complaint must "set forth his legal contentions and specifically cite the record by page number for factual contentions" (*id.* at 2, emphasis in original).  Plaintiff was clearly warned that the failure "to support factual contentions with accurate, precise citations to the record would result in the contention(s) being disregarded for lack of proper development" (*id.*, emphasis in original).  Plaintiff's SSA file in this case is unusually lengthy, consisting of a total of 1232 pages, approximately 889 pages of which are medical records.  Plaintiff has also attached to his memorandum 121 pages of additional evidence (doc. 32).  Despite the court's clear instructions that in his memorandum he <u>must</u> cite the record by page number for factual contentions—an instruction of particular, critical importance in a case with a record as massive as the one here—Plaintiff failed to do so.  The memorandum contains not a single page citation to the administrative record or to the attached exhibits.[4]  As Plaintiff's memorandum therefore is not in compliance with the court's instructions, the court could disregard his factual contentions for lack of proper development.  Such an approach would not be unreasonable, especially given the clarity of the court's instructions to Plaintiff in the Scheduling Order, the voluminous record involved, and the unnecessary and wasteful expenditure of limited court resources needed to attempt to remedy the difficulties caused by Plaintiff's noncompliance.  In consideration of Plaintiff's pro se status, however, the court shall not proceed so harshly.  Rather, in an effort not to prejudice the pro se Plaintiff unduly (despite his utter failure to follow the court's

---

[4]  Moreover, Plaintiff's four motions to file medical records (docs. 35, 43, 44, 45), include forty-five pages of proposed additional exhibits, and his reply to the Commissioner's response to the first motion (doc. 41), includes three pages of proposed additional exhibits.  Neither the reply nor any of the motions contain page number citations to the forty-eight pages of proposed additional exhibits.

instructions) while at the same time conserve the court's resources, the court shall conduct a summary review of the record that is largely based on the facts and evidence set forth in the ALJ's decision while organized around the impairments Plaintiff identifies and briefly discusses in his memorandum.[5]  The review shall also note any relevant evidence that was supplied by Plaintiff to the court and was before the ALJ[6]; relevant evidence in the record that the court has identified; and, where relevant and properly referenced, the evidence discussed in the Commissioner's memorandum (which adopts and supplements the ALJ's statement of facts).  With that preface, the court proceeds with its abbreviated outline of Plaintiff's relevant medical history.[7]

- Eyes

The report of a January 2010 optometry examination notes that Plaintiff first became aware in the 1970s, while undergoing an Army enlistment examination, that he has red-green color blindness (tr. 19, 872).  His best corrected acuity at the time of the January 2010 examination was 20/25 right, 20/25 left, and his best corrected near acuity was 20/25 left and 20/25 right (tr. 872).  There was no other reported eye injury, surgery, or disease (*id.*).  An optometry note dated March 2010 reporting on an intraocular pressure check states "glaucoma unlikely" and advises Plaintiff to return in one year or as needed (tr. 677).

- Right Wrist

---

[5]  To the extent Plaintiff's memorandum (doc. 32) seeks to incorporate by reference other impairments that appear only in his complaint (doc. 1) (i.e., sleep apnea and COPD) (*compare* doc. 1 at 3 *with* 32), the court includes them in this summary.  The other impairments alleged by Plaintiff in his memorandum include problems with his eyes, right wrist, spine, seizure disorder, depression/mood disorder, knee, and pain medication side effects (*see* doc. 32).  Plaintiff does not assert any error in connection with the ALJ's assessment of his obesity and thus the court does not address this condition.  The court also notes that in Plaintiff's reply he seeks to make some additional argument, apparently either in response to the ALJ's decision or the Commissioner's memorandum.  As may be appropriate, the court addresses these matters in the Discussion section of this Order.

[6]  Thus, in this section of its Order the court references only the relevant medical records, and associated impairments, that were before the ALJ in reaching his decision.  Plaintiff submitted the following pages from the administrative record with his memorandum: doc. 32 at 4–14 (tr. 181, 182, 269, 270, 277, 278–80, 283, 284), only one of which (tr. 181) need be included in the court's discussion.  As to new evidence Plaintiff submitted to the AC or to this court (i.e., evidence not presented to the ALJ), the court addresses such evidence separately following its discussion of the ALJ's decision.

[7]  Plaintiff's medical care was provided through the Veterans Administration, primarily at its own facilities, but also by referral to some outside providers.  For simplicity's sake, the court does not identify most providers by name.

A Treating Source Orthopedic Questionnaire completed by Plaintiff's treating orthopedist, Ben Prewitt, M.D., in January 2009 notes that Plaintiff's grip strength was 5/5 (tr. 389).  The physician also noted that Plaintiff might be slightly limited in performing fine/gross manipulation in the right hand due to a fracture of his right wrist (*id.*) that was surgically repaired with artificial bone in 1981 (tr. 430, 475).   A Treating Source Orthopedic Questionnaire completed in September 2009 opines that Plaintiff is capable of performing fine/gross manipulation on a sustained basis (tr. 562).   Notes from the Veterans Administration dated between January 2009 and July 2010 identify Plaintiff's numerous health problems, including lower back pain/lumbar radiculopathy/lumbago, a knee injury/osteoarthrosis of the knee, allergic rhinitis, mood disorder/depressive disorder, seizures, tobacco use disorder, lumbago, arthralgia, asthma, bronchitis, hyperlipidemia, unspecified joint pain, seizures, osteoarthritis, morbid obesity, neck pain/cervicalgia, syncope, contusion of the hand, pharyngitis, and olecranon bursitis (tr. 417–20, 469–70, 605, 795, 818–19, 902).   It does not appear that any of the notes includes mention of nerve damage to the right wrist, degenerative bone disease, or carpal tunnel syndrome.

- Left Knee and Spine

Diagnostic imagery tests obtained in April 2009 and December 2009 show severe degenerative changes in Plaintiff's left knee (tr. 19, 778–79).  A March 2010 report notes that Plaintiff  was using a cane and limping slightly from knee pain (tr. 19, 784).  In June 2010 Plaintiff reported that a steroid injection in his left knee had not helped, that he was again having pain, and that he wanted to proceed with surgery (tr. 19, 807).   According to the July 2010 evaluation of orthopedic surgeon Samuel Capra, M.D., Plaintiff  reported a nine or ten-year history of knee pain, with his "primary complaint [now being] swelling and pain with weight bearing" (tr. 922).   Dr. Capra noted that naproxen and steroid injections had not helped Plaintiff's pain, which Dr. Capra described as moderate to severe (*id.*).   Radiographs of the left knee revealed moderately severe osteoarthritis (tr. 925).   Dr. Capra's impression was left knee degenerative joint disease, morbid obesity, and a history of sleep apnea (tr. 923).  Dr. Capra thought Plaintiff was a surgical candidate for knee replacement arthroplasty because conservative therapy had failed (*id.*).  He stated that Plaintiff's work status was "off," that Plaintiff required the use of a walker at that time, and that

Plaintiff was limited to lifting no more than five pounds (tr. 995).  In July 2010 Plaintiff reported that knee replacement surgery was scheduled for August 2010 (tr. 19, 329).

With respect to Plaintiff's spinal impairment, diagnostic imagery tests obtained in April 2009 reveal mild to moderate spinal canal and bilateral inferior neural foraminal narrowing at L1-L2; moderate to severe bilateral neural foraminal narrowing and moderate central spinal canal narrowing at L4-L5; and moderate to severe bilateral neural foraminal narrowing at L5-S1 (tr. 19, 778).  A September 2009 examination report indicates that Plaintiff had a minimally antalgic gait; was able to toe, heel, and tandem walk; showed good range of motion with lumbar bending and decreased lumbar extension; and had a negative straight leg raising test (tr. 887–88).  His physician opined that surgery would not help Plaintiff's back pain and advised Plaintiff to undergo physical therapy; if he experienced no improvement, injections and pain medication would be the next option (tr. 888). Plaintiff was also advised that quitting smoking, stopping driving, and losing weight would help to reduce his back pain (*id.*).  A Treating Source Orthopedic Questionnaire completed in September 2009 notes that Plaintiff did not require a handheld assistive device to ambulate (tr. 562).  In March 2010 Plaintiff had positive straight leg raising tests bilaterally (tr. 19, 776).  A March 2010 physical therapy discharge note states that Plaintiff had surpassed his weight loss goal while participating in a kinesiotherapy program in preparation for knee and back surgery, having lost eighteen pounds at that time (tr. 687; *see also* tr. 711–12).  At discharge, as he had at approximately seven prior visits over the previous two months, Plaintiff reported a pain level of seven on a ten point scale (7/10) (tr. 675–76, 678, 680–84, 687); with one exception, it was also noted that Plaintiff entered the facility ambulating without assistance.  During the course of his physical therapy Plaintiff's ability to exercise steadily improved; on his final day in the program he used the recumbent bike and stepper, and he also performed step-ups, fifty-five pound leg extensions, seventy pound leg flexions, fifty pound chest presses, eighty pound seated rows, and treadmill work; it was noted that he would continue with daily home exercise and pedal work (tr. 19, 687).  A June 2010 examination revealed no motor or sensory neurological deficits and an intact range of extremity motion (tr. 19, 904). Plaintiff reported that, following recuperation from his knee replacement surgery, he anticipated undergoing spinal surgery (tr. 329).

•      Seizure Disorder

Plaintiff testified at the July 2010 hearing that he had a prior history of seizures (tr. 18, 70). The seizures, which varied in severity, typically lasted from three to ten minutes; according to Plaintiff, he had never suffered a grand mal seizure (tr. 71).  Plaintiff had experienced seven to eight seizures during the fall of 2009 (tr. 18, 70), with the last one occurring in January 2010 (tr. 18, 69). Plaintiff took daily medication for his seizure disorder since reporting the reoccurrence of seizures in late 2009 (tr. 19, 908), and the medication seemed to control the seizures well (tr. 803, 838).  An electroencephalogram taken in January 2010 was normal; however, based upon his reported history of seizures, Plaintiff was instructed not to drive and advised to avoid heights, dangerous machinery, swimming, and bathing alone (tr. 19, 721–22).

- Depression/Mood Disorder

Plaintiff testified that he suffers from depression, which he attributed largely to not being able to work due to his physical problems and having no money to pay bills, but he indicated that depression would not prevent him from working (tr. 16, 67).  The July 2009 Treating Source Mental Status Report completed by psychiatrist Margaret Miller, M.D., likewise reflects that Plaintiff's back problems, not his depression, limited his ability to work eight hours a day for five days a week (tr. 18, 552).  Julian A. Salinas, Ph.D., concluded in February 2009 and June 2009 that Plaintiff's emotional problems did not appear to be primary contributors to any deficits in adaptive functioning (tr. 394, 523).  Non-examining state experts who reviewed Plaintiff's records in February 2009 and July 2009 opined that he has no severe mental impairment (tr. 19, 395–408, 524–37).

- Sleep Apnea/COPD

Plaintiff was diagnosed with severe obstructive sleep apnea based on diagnostic testing conducted on June 17, 2010 (tr. 19, 743).  The obstructive sleep apnea was not responsive to CPAP [continous positive airway pressure] therapy but was responsive to BIPAP [bilevel positive airway pressure] therapy (tr. 743).  Plaintiff was advised to participate in BIPAP initiation therapy and a BIPAP Compliance Program or otherwise begin BIPAP therapy.  He was further advised to avoid taking sedatives and drinking alcohol at bedtime, operating heavy equipment, and driving while feeling drowsy (*id.*).

Plaintiff underwent chest x-rays on June 21, 2010 (tr. 19, 766).  The impression of the physician who reviewed the studies was COPD, with borderline cardiac enlargement but no acute pulmonary abnormality (tr. 766).

•        Pain Medication Side Effects

Plaintiff testified at the July 2010 hearing that his knee and back pain became so severe that he could not manage without pain medication (tr. 64).  The medication, however, made him "[g]roggy" and drowsy "pretty much a lot" (tr. 8, 66), and his physician advised him he should not run equipment or drive while using it (tr. 64).  Plaintiff stated that he had not driven in the previous month but acknowledged that in the month before that he had driven himself several times from his home in DeFuniak Springs, Florida, to a local grocery store, and to Veterans Administration medical appointments in Pensacola, Florida, or Biloxi, Mississippi (tr. 18, 51, 69).  In a Supplemental Pain Questionnaire received by the SSA in December 2008, Plaintiff reported feeling drowsy from his pain medication (tr. 181).  On a form which Plaintiff submitted electronically to the SSA over the internet in March 2009, he reported taking propoxyphene for back and knee pain but he identified no side effects that he was experiencing (doc. 37 at 5; tr. 243).  On a similar report from July 2009 Plaintiff listed the pain medication hydrocodone with drowsiness and "[g]rogginess" as side effects (tr. 258).

V.      ISSUES PRESENTED

Plaintiff contends that the Commissioner erred in failing to approve his application for SSI benefits and that the court should now award them.  Plaintiff apparently asserts error with respect to the ALJ's consideration of his "eyes problems," including color blindness, visual acuity, and glaucoma, which "make[ ] it hard to work in an office"; problems with his right wrist, including nerve damage, degenerative bone disease, and carpel tunnel syndrome; spinal and knee conditions; seizure disorder; depression/mood disorder; sleep apnea/COPD; the side effects of his pain medications, "which make it dangerous to drive and work while taking them"; and the testimony of the VE, whose description of the tax preparer position does not comport with the manner in which Plaintiff actually performed the job (doc. 32).  As noted, Plaintiff also seeks to submit additional medical evidence with his memorandum to support his demand for reversal and an award of benefits. In response, the Commissioner argues that his decision should be affirmed because Plaintiff had a

fair hearing and full administrative consideration in accordance with applicable statutes and regulations, and substantial evidence as a whole supports his decision (doc. 37 at 10).   More specifically, the Commissioner argues that the ALJ's RFC finding is supported by substantial evidence, the ALJ properly determined that Plaintiff could perform his past relevant work, and the evidence submitted by Plaintiff with his memorandum does not prove that he is disabled (*id.* at 3, 9).

In the first part of the Discussion section of this Order the court considers two matters:  1) whether, based on the record before the ALJ, the ALJ's unfavorable decision is supported by substantial evidence and is in accordance with proper legal principles; and 2) whether the evidence Plaintiff submitted to the AC renders the denial of benefits erroneous.[8]  In the second part of the Discussion section the court addresses the additional evidence Plaintiff seeks to file with the court as attachments to his memorandum (doc. 32), four motions (docs. 35, 43, 44, 45), and reply to the Commissioner's response to the first motion (doc. 41) to determine if this evidence provides any basis for remanding the case to the Commissioner for further proceedings.

VI.   DISCUSSION

A.   ALJ's Unfavorable Decision and Appeals Council's Denial of Request for Review

1.   The ALJ's Unfavorable Decision

The court first considers Plaintiff's apparent argument that the ALJ erred in considering his eye impairments, including color blindness, visual acuity, and glaucoma.  The ALJ acknowledged Plaintiff's color blindness in Plaintiff's RFC by limiting Plaintiff to work that did not require him to identify or distinguish items requiring color vision (tr. 17).  Additionally, the ALJ asked the VE if an individual with an RFC for light work[9] that included color blindness could perform any of

---

[8]  Construing Plaintiff's appeal liberally, as it must, the court views the appeal as challenging both the ALJ's decision to deny benefits and the AC's decision to deny review based on new evidence.  Thus the court considers whether the ALJ's decision is supported by substantial evidence and whether the new evidence submitted to the AC rendered the denial of benefits erroneous.  Ingram, 496 F.3d at 1265–66.

[9]  The ALJ's hypothetical question to the VE additionally included the RFC to perform light work, that is, the ability to lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk for six hours and sit six hours in an eight-hour workday; push and pull without restriction; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds.  The hypothetical question also noted that the individual must avoid extreme heat, extreme cold, wetness, humidity, vibration, pulmonary irritants, and hazards.

Plaintiff's past relevant work, either as Plaintiff actually performed it or as it is generally performed. Citing the guidelines under the Dictionary of Occupational Titles ("DOT"), the VE responded in the affirmative with regard to Plaintiff's past relevant work as a tax preparer (tr. 77–78).[10]   As to Plaintiff's alleged impairments of limited visual acuity and glaucoma, although Plaintiff states these conditions (along with his color blindness) would make working in an office "hard" for him, he does not allege or show that the ALJ should have found them to be "severe" impairments at step two of the sequential analysis[11] or listed impairments at step three of the analysis.[12]   Moreover, the court is aware of no evidence that was before the ALJ that would support the conclusion that these impairments would impact Plaintiff's RFC to perform a limited range of light work or, more specifically, his ability to work as a tax preparer.   As noted above, the record reflects that in January 2010 Plaintiff's best corrected acuity was 20/25 right, 20/25 left, and his best corrected near acuity was 20/25 left and 20/25 right (tr. 872).   Thus Plaintiff's corrected visual acuity, including for near vision, in both eyes at that time appears to be near the well-known normal range for visual acuity of 20/20.   Additionally, the January 2010 report identifies no disease, including glaucoma, detected in Plaintiff's eyes (*id.*), and a March 2010 optometry note states "glaucoma unlikely" (tr. 677). Accordingly, the court finds no basis to assign error to the ALJ's assessment of Plaintiff's alleged eye impairments.

---

[10]   Although an ALJ is not required to rely on a VE in determining whether a claimant can return to his past relevant work, *see* Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990), the ALJ may rely on such testimony in determining whether a claimant can perform his past relevant work, provided that testimony is based on a hypothetical question that includes all of the claimant's limitations that are supported by the record.   *See* Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).   Based on its review of the record, the court concludes that the hypothetical question the ALJ posed to the VE adequately included all of Plaintiff's limitations that were supported by the record.   Thus the ALJ was entitled to rely on the VE's opinion.   *See* Jones, 190 F.3d at 1228.

[11]   At step two of the sequential analysis, the claimant must prove he is suffering from a severe impairment or combination of impairments which significantly limits his physical or mental ability to perform "basic work activities." *See* 20 C.F.R. §§ 416.920(c), 416.921(a).   Basic work activities include such physical functions as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; they also include the capacities for seeing, hearing, and speaking. 20 C.F.R. § 416.921(b).

[12]   The Commissioner's rules provide that if a claimant has an impairment that is listed in or equal to an impairment listed in Appendix 1, Subpart P, following 20 C.F.R. § 404.1599, a finding of disability will be made at step three without considering the claimant's age, education, and work experience. 20 C.F.R. § 416.920(d).

Plaintiff also complains of problems with his right wrist, including nerve damage, degenerative bone disease, and carpal tunnel syndrome that would preclude his working as a tax preparer (doc. 32 at 1).  As noted, Plaintiff has failed to identify by page number where in the record support for this assertion may be found.  Although in his decision the ALJ did not discuss any problems with Plaintiff's right wrist, this is not surprising.  As outlined above, the court's summary review of the record before the ALJ revealed virtually no references to any such problems, other than the reference to surgery in 1981 when the wrist was broken and two references to the ability to perform fine/gross manipulation, one which found no restrictions at all and the other which indicated there might be a "slight" restriction (tr. 389, 562).  Indeed, while the record is replete with references to myriad other conditions, the record that was available to the ALJ appears to lack references to nerve damage, degenerative bone disease, or carpal tunnel syndrome involving the right wrist.  Thus the court finds no error in the ALJ's consideration of this alleged group of impairments at steps two or three of the sequential analysis or in connection with his determination that Plaintiff retained the RFC to perform a limited range of light work and, specifically, the ability to work again as a tax preparer.

The record, as outlined by the ALJ and described by the court, above, also does not support a finding of error by the ALJ concerning his assessment of Plaintiff's knee and spinal impairments, both of which the ALJ found to be severe at step two of the sequential analysis.  With respect to Plaintiff's left knee impairment, the ALJ acknowledged that diagnostic tests from April 2009 and December 2009 showed severe degenerative changes (tr. 19, 778–79), that in March 2010 Plaintiff limped slightly and used a cane to walk[13] (tr. 19, 784), and that in June 2010 Plaintiff wanted to proceed with knee surgery, which he reported was scheduled for August 2010 (tr. 19, 807).  Significantly, however, the ALJ also found that despite his knee impairment Plaintiff had demonstrated the ability to engage in "strenuous physical therapy" in February and March 2010 (tr.

---

[13] Plaintiff apparently contends the ALJ did not acknowledge his need to use a cane and wheel chair (tr. 41 at 5).  The ALJ did, however, comment at least twice regarding the use of assistive devices: once involving an instance when Plaintiff was reported to be using a cane (tr. 19) and once involving the opinion that Plaintiff did not require a cane (tr. 18).  The court notes that the record also contains numerous references to Plaintiff's ambulating without an assistive device while participating in physical therapy (*see* tr. 675, 676, 678, 680, 682, 683, 684) and one when he did (tr. 674).  Plaintiff points to nothing in the record before the ALJ, nor did the court locate anything in the course of its summary review, that shows Plaintiff required the use of a wheelchair.

19), a finding which the record before the ALJ supports and which is not inconsistent with the RFC to perform a limited range of light work (tr. 687).[14]  Such conclusions are equally applicable to the ALJ's consideration of Plaintiff's spinal condition.[15]  Moreover, with respect to Plaintiff's spinal condition, although the ALJ noted that diagnostic imagery tests of Plaintiff's lumbar spine from April 2009 revealed mild to severe changes at three levels (tr. 19, 778), he also referred to reports from September 2009, March 2010, and June 2010 that reflected only limited positive findings on physical examination (tr. 19, 887–88, 776, 904).  In short, the court is aware of nothing in the record before the ALJ demonstrating that, in connection with Plaintiff's knee and spinal impairments, the ALJ committed error at step three by finding these conditions did not meet a listed impairment; in his RFC determination that Plaintiff could perform a limited range of light work; or at step four in finding that Plaintiff could perform his past relevant work as a tax preparer.

The ALJ's assessment of Plaintiff's seizure disorder likewise appears to be free of reversible error.  The ALJ concluded that Plaintiff's medication level had been titrated and stabilized, that his seizures currently appeared to be well controlled, that he had not had a seizure since January 2010, and that a January 2010 electroencephalogram was normal (tr. 18, 69, 803, 838).  Although Plaintiff submits that this disorder was "unstable, with an increase in numbers of seizures, the severity of the attacks, and the amount of medication prescribed to me" (doc. 41 at 5), he has not pointed to any evidence in support of these assertions nor has the court located any such evidence in the records reviewed by the ALJ.

Plaintiff has also failed to show error in the ALJ's assessment of his depression and mood disorder.  Plaintiff himself testified at the administrative hearing that his depression would not

---

[14] Plaintiff submits that the restrictions imposed by Dr. Capra lasted through February 2011 and show that he was unable to work (doc. 32 at 3).  The court is aware of only one record from Dr. Capra that was before the ALJ that restricts Plaintiff from lifting more than five pounds and from performing any work: the record dated July 15, 2010, which was just prior to Plaintiff's August 2010 knee surgery.  Plaintiff points to nothing in the administrative file that shows Dr. Capra restricted him from work or from lifting more than five pounds for any extended period of time nor is the court aware of any such records.

[15] Indeed, Plaintiff's demonstrated ability to exercise strenuously would not be inconsistent with the ability to perform sedentary work.  Under SSA regulations, a claimant who is capable of performing light work generally is also capable of performing sedentary work.  20 C.F.R. § 416.967(b).  In this case, the VE testified that even if Plaintiff retained only the RFC for sedentary work, per the DOT guidelines he could perform the job of tax preparer (tr. 78).

prevent him from working (tr. 16, 67).  Furthermore, the reports completed by Drs. Miller and Salinas reflect that Plaintiff's depression was not a limiting factor in his ability to work (tr. 18, 394, 523, 552).  These opinions find further support in the assessments of the non-examining state experts who reviewed Plaintiff's records in February 2009 and July 2009 and opined he did not have a severe mental impairment (tr. 19, 395–408, 524–37).

Next, Plaintiff complains that the ALJ did not consider his obstructive sleep apnea impairment (doc. 41 at 5).  This is incorrect.  The ALJ found that Plaintiff's obstructive sleep apnea, as well as his COPD, were severe impairments at step two (tr. 19).  The ALJ noted that Plaintiff had been diagnosed with severe obstructive sleep apnea based on diagnostic testing conducted in June 2010 (tr. 19, 743), and he noted Plaintiff's June 2010 chest x-rays, which found COPD but only borderline cardiac enlargement and no acute pulmonary abnormality (tr. 766).  Taking into account Plaintiff's obstructive sleep apnea and his COPD conditions in his RFC finding, the ALJ required that Plaintiff avoid certain environmental conditions such as extreme heat, extreme cold, wetness, humidity, vibration, pulmonary irritants, and hazards (tr. 17).  Additionally, the ALJ included these restrictions in the hypothetical question he posed to the VE, who testified that even with these restrictions Plaintiff could work as a tax preparer (tr. 77–78).  The court thus finds no error in the ALJ's consideration of Plaintiff's obstructive sleep apnea and COPD conditions.

Plaintiff argues that the side effects of his pain medication—which he has described as "[g]rogginess" and drowsiness (tr. 66)—"make it dangerous to drive and work while taking them." (doc. 32 at 3).  Plaintiff acknowledged, however, at the hearing that he had driven an automobile on several recent occasions, including nearby his home to buy groceries as well as more significant distances to medical appointments in Pensacola and Biloxi (tr. 56–57).[16]  Any grogginess or drowsiness caused by Plaintiff's pain medications apparently was not so severe as to be "dangerous" and thus preclude his driving on those occasions.  In any event, Plaintiff does not assert, and there is no evidence of which the court is aware that suggests, that work as a tax preparer involves driving

---

[16] Plaintiff contends in his reply he did not drive himself to a football game in Tennessee, "as stated," but rather rode along with a friend (doc. 41 at 5).  Neither the ALJ nor the Commissioner made the assertion of which Plaintiff complains, however.  Rather, the ALJ noted that Plaintiff had "taken a trip" to Tennessee for a football game (tr. 18), and the Commissioner noted that he had "travel[ed]" there (doc. 37 at 5).

or that it would be "dangerous" for Plaintiff to take pain medications while engaged in work as a tax preparer.[17]

Finally, Plaintiff asserts that the ALJ should not have relied on the VE's testimony because the VE's "numbers" were "incorrect" for the tax preparer job as Plaintiff had actually performed it. According to Plaintiff, he "worked 16 to 17 hrs a day standing and had to lift boxes 10 to 100 pounds, which [he] cannot do now." (doc. 32 at 2). A claimant who can perform his past relevant work, *either* as he actually performed it or as it is generally performed in the national economy, is not disabled. *See* 20 C.F.R. § 416.960(b)(2) (3). As noted above, the ALJ in this case asked the VE whether an individual with the same RFC ascribed to Plaintiff could perform any of Plaintiff's past relevant work, *either* as Plaintiff actually performed it or as it is generally performed. The VE responded that the individual could work as a tax preparer (tr. 77–78). Thus, to the extent the ALJ concluded that Plaintiff could perform his past relevant work as it is generally performed in the national economy rather than as Plaintiff may have previously performed it, he did not err.

In summary, upon review of the record as outlined above, the court concludes that the ALJ properly considered Plaintiff's impairments, both individually and in combination, *see* Jones v. HHS, 941 F.2d 1529, 1533 (11th Cir. 1991), and determined that those impairments did not render Plaintiff disabled. The court concludes the ALJ's decision is based on substantial evidence and on proper legal principles. Accordingly, the court should affirm the ALJ's decision unless the evidence Plaintiff submitted to the AC rendered the denial of benefits erroneous. As discussed below, the court finds no such error.

2.      The Appeals Council's Denial of the Request for Review

Section 405(g) permits a district court to remand an application for benefits to the Commissioner by two methods: (1) under sentence four of the statutory provision, the court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

---

[17] Plaintiff complains that "companies will not hire you if you are taking severe amounts of pain meds [d]ue to their insurance" (doc. 32 at 3), and that "nobody will hire [him] due to [his] [reduced] typing speed" caused by his right wrist problems (*id.* at 2). Whether a company will hire a particular claimant is not relevant to making a disability determination. Instead, the test is whether work exists that the claimant has the capacity to perform. *See* 20 C.F.R. § 416.966; Glassman v. Sullivan, 901 F.2d 1472, 1474 (8th Cir. 1990) (test is not whether claimant can get hired but whether she has the capacity to adequately perform the job).

Security, with or without remanding the cause for a rehearing"; or (2) under sentence six, the court may "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g). Sentence-six and sentence-four remands are designed to remedy separate problems.  Ingram, 496 F.3d at 1261.   Sentence-six remands are "available when evidence not presented to the Commissioner at any stage of the administrative process requires further review."  Id. at 1267. Sentence six "does not grant a district court the power to remand for reconsideration of evidence previously considered by the [AC]."  Id. at 1269.   To show that a sentence-six remand is needed, "the claimant must establish that: (1) there is new, noncumulative evidence; (2) the evidence is 'material,' that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for the failure to submit the evidence at the administrative level."  Caulder v. Bowen, 791 F.2d 872, 877 (11th Cir. 1986); Vega v. Comm'r of Soc. Sec., 265 F.3d 1214, 1218 (11th Cir. 2001); Ingram, 496 F.3d at 1267 (noting that remand is "proper under sentence six when new material evidence that was not incorporated into the administrative record for good cause comes to the attention of the district court").

In contrast, a sentence-four remand is appropriate when the evidence was properly before the Commissioner, but "the [AC] did not adequately consider the additional evidence."  Ingram, 496 F.3d at 1268 (quotation omitted).  When evidence is submitted for the first time to the AC, that new evidence becomes part of the administrative record.  Keeton, 21 F.3d at 1067.  The AC considers the entire record, including the new, material, and chronologically relevant evidence, and will review the ALJ's decision if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. § 404.970(b).  New evidence submitted by a claimant to the AC must relate to the period on or before the date of the ALJ's decision.  See Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999); 20 C.F.R. § 404.970(b) (requiring AC to consider new evidence "only where it relates to the period on or before the date of the administrative law judge hearing decision").  Under sentence four, the district court must generally "consider evidence not submitted to the administrative law judge but considered by the [AC] when that court reviews the Commissioner's final decision denying Social Security benefits."  Wilson, 179 F.3d at 1257–58; see

*also, id.* at 1265–69 (suggesting that the "good-cause" standard, for failing to timely submit evidence, is immaterial to sentence-four situations where evidence is submitted to the AC and incorporated into the administrative record). A sentence-four remand is unwarranted if there is no "reasonable possibility that [the new evidence] would change the administrative result." Milano v. Bowen, 809 F.2d 763, 766 (11th Cir. 1987). *See also* Jackson v. Chater, 99 F.3d 1086, 1091–92 (11th Cir. 1996) (generally speaking, to warrant a sentence-four remand court must either find that the decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim). When the AC has considered the new evidence and denied review, the task of the district court is to determine "whether the new evidence renders the denial of benefits erroneous." Ingram, 496 F.3d at 1262.

As previously noted, on September 24, 2010, the ALJ issued a decision denying Plaintiff's claim for SSI benefits. Thereafter, in connection with Plaintiff's request for review of the ALJ's decision, Plaintiff submitted additional evidence to the AC (*see* tr. 1, 4–5, 944–1232). The additional evidence—totaling some 288 pages—includes records dated from September 1, 2010 (tr. 946) through March 22, 2011 (tr. 1231–32). On April 14, 2011, after considering this evidence, the AC denied Plaintiff's request for review (tr. 1–5). In its notice denying review, the AC specifically stated it had considered the additional evidence presented by Plaintiff, as well as the reasons Plaintiff disagreed with the ALJ's decision (tr. 1–2). The AC concluded, however, that the additional information provided no "basis for changing the [ALJ's] decision" (tr. 2). The AC thus did not err by failing to consider the new evidence because, in fact, it did consider it. *See* Keeton v. Dep't of Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994). Moreover, to the extent Plaintiff contends the AC was required to explain its denial of review, the contention fails. *See* Burgin v. Comm'r of Social Sec., 420 Fed. App'x 901, 903 (11th Cir. 2011) ("The AC considered and incorporated the additional evidence submitted by Burgin into the record. Contrary to Burgin's argument, the AC was not required to explain its denial of review.") (citing Ingram, 496 F.3d at 1261). In light of the foregoing, this court is required to determine whether the "new evidence renders the denial of benefits erroneous." Ingram, 496 F.3d at 1262.

The court has reviewed the evidence that Plaintiff submitted to the AC (*see* tr. 944–1232) and notes the following. Many of these records concern Plaintiff's August 10, 2010, knee surgery

and subsequent treatment or follow-up care, including for some transitory complications (tr. 948–61, 965–68, 971–85, 990–92, 996–98, 1003, 1023–36, 1064–72, 1074–76, 1078–88, 1090–1108, 1110–28, 1222–24).  The court is satisfied there exists no reasonable possibility that  this evidence of Plaintiff's knee surgery (which surgery was anticipated and the need for which was discussed at length in the evidence available to the ALJ) or the evidence of the aftercare related to that surgery would change the administrative result.  The court notes that one of these records (dated September 13, 2010, or approximately one month following surgery and approximately two weeks prior to the issuance of the ALJ's September 24, 2010, decision) indicates that—while he maintained Plaintiff on an "off work" status and limited him to lifting no more than five pounds at the time—Dr. Capra thought Plaintiff was "doing well" following his total knee replacement (tr. 1003).  To be sure, during his post-surgery rehabilitation Plaintiff continued to report knee pain and difficulty walking (*see* tr. 955).  Plaintiff also acknowledged, however, at a September 23, 2010, physical therapy visit—which took place one day prior to the issuance of the ALJ's decision—that he had been "on [his] leg most of the day on Saturday performing yard work" and that icing the knee for several hours had decreased the level of pain (*id.*).

There also is no reasonable possibility that any of the other records Plaintiff submitted to the AC would alter the administrative result.  Many are merely administrative in nature (dealing with the scheduling of appointments, cover letters, Plaintiff's correspondence, and the like) (*see* tr. 944–47, 962–64, 970, 986–89, 1004, 1015, 1021–22, 1037, 1038–45, 1048, 1053–60, 1063, 1073, 1077, 1089, 1109, 1129, 1132, 1142–48, 1154–71, 1177–79, 1191–94, 1203–05, 1213–15, 1220–21, 1226–27, 1230), and thus are not material to the disability determination.  Moreover, other records are duplicates of records that were before the ALJ which Plaintiff also submitted to the AC (*see, e.g.*, tr. 969, 995, 1001, duplicating tr. 924; tr. 993–94, 999–1000, duplicating 922–23; tr. 1002, duplicating tr. 888, tr. 1187, 1222, duplicating tr. 925).[18]   Thus none of this evidence is noncumulative or new.

---

[18]  Plaintiff has in fact filed countless duplicate copies of various exhibits, both with the AC and with the court, not all of which are listed here because they are too numerous.  Plaintiff's actions have only served to enormously, and needlessly, congest and confuse the record.

In short, there is no reasonable possibility that the knee surgery, administrative, or duplicative evidence would affect the result reached by the ALJ.  Thus this evidence did not render the denial of benefits to Plaintiff erroneous.

The remaining records submitted to the AC were created after September 24, 2010, the date of the ALJ's decision (*see* tr. 1005–14, 1016–20, 1046–47, 1049–52, 1061–62, 1130–31, 1133–41, 1149–53, 1172–76, 1180–1190, 1195–1202, 1206–12, 1216–19, 1223, 1225, 1228–29, 1231–32). The dates of these records notwithstanding, the AC apparently concluded that the evidence was chronologically relevant, as the record does not reflect that the AC returned it to the claimant with an explanation and advised him of his right to file a new application, as 20 C.F.R. § 416.1476(b) provides.  Instead, as noted, the AC indicated that it made the evidence a part of the administrative record and considered the evidence in determining whether to review the decision (tr. 1–2).  The court interprets such action "as an implicit determination [that plaintiff] had submitted qualifying new evidence for consideration."  Martinez v. Barnhart, 164 F. App'x 725, 731 (10th Cir. 2006). The court briefly outlines this evidence before considering whether it merits a sentence four remand.

A record from October 2010 notes Plaintiff's report that he was doing much better following knee surgery, that he still suffered some back pain with radiation to the left leg, and that he had experienced "numbness of the R[ight] hand for yrs" (tr. 1020).  The assessment was lumbar radiculopathy, probable carpal tunnel syndrome, obesity, seizure disorder, and COPD (*id.*).  Notes from November 2010 show that Plaintiff reported moderate or no knee pain (tr. 1005, 1010, 1061), and an x-ray report showed no acute process (tr. 1223). A neurology note from November 2010 states that Plaintiff suffered from recurrent seizures, which were controlled by medication, and sleep apnea, which apparently had not been treated (tr. 1011).  To assess a suspected episode of syncope, Plaintiff's physician ordered Holter monitoring for Plaintiff (*id.*).  Results of this test, which was conducted in December 2010, were unremarkable (tr. 1016–17).

An MRI [magnetic resonance imaging] of Plaintiff's lumbar spine obtained in December 2010 showed progressive degenerative disc disease at L4-5 and L5-S1 compared with the previous study taken in April 2009; the most severe changes were on the left at L4-5 and appeared to have advanced slightly since the prior examination (tr. 1046–47, duplicates at 1180–81, 1189–90, 1228).

The assessment of a February 2011 examination was lumbar radiculopathy, probable carpal

tunnel syndrome, obesity, seizure disorder, and COPD. Tests to assess carpal tunnel syndrome were pending (tr. 1153, 1176). A neurologist's report in March 2011 states that Plaintiff complained of numbness of the entire right hand which began after a 1981injury (tr. 1184, duplicates at 1197, 1210, 1217). Plaintiff reported that the grip in this hand was becoming weaker but that the numbness had been the same since first being injured (*id.*). An electrodiagnostic study was abnormal, revealing severe right median mononeuropathy [nerve damage] at the wrist (tr. 1185, duplicates at 1196, 1211, 1218). It was noted there was a possibility of nerve entrapment and the potential for some benefit from surgery and thus Plaintiff would be referred for x-rays and to a hand surgeon (*id.*). Radiographs taken of Plaintiff's right wrist in March 2011 showed advanced degenerative changes throughout (tr. 1182, 1216). In March 2011 Plaintiff complained of severe low back pain that radiated to the left hip (tr. 1231). His diagnoses were degenerative disc disease of the lumbar spine, lumbago, and radicular pain. At his current weight of 240 pounds Plaintiff was deemed too overweight for surgery. Other pain management courses therefore were suggested (tr. 1232).

The court concludes there is no reasonable possibility that the evidence just discussed would render the denial of benefits erroneous. The evidence suggests that Plaintiff's knee condition continued to improve following his August 2010 surgery. Moreover, as the evidence on which the ALJ relied also showed, Plaintiff's seizures appeared to be controlled by medication and his sleep apnea remained untreated. The evidence shows that Plaintiff's lumbar spine impairment worsened over time but it does not suggest that any such deterioration was relevant to Plaintiff's condition on or prior to the ALJ's September 24, 2010, decision; in other words, the evidence of worsening is not probative of disability during the specific period under review. With respect to Plaintiff's wrist right, the new evidence reflects that Plaintiff complained of numbness and reduced grip strength and that certain tests were conducted in March 2011 to investigate his complaints. An x-ray of the wrist showed advanced degenerative changes and Plaintiff indicated his grip strength had been decreasing over time; notably, however, in January 2009 Dr. Prewitt found Plaintiff's grip strength to be 5/5, and he stated there was the possibility of only a slight limitation in performing fine/gross manipulation (tr. 389). Additionally, in September 2009 Plaintiff was described as being capable of performing fine/gross manipulation on a sustained basis (tr. 562). While the March 2011 electrodiagnostic studies showed severe right median mononeuropathy at the wrist (tr. 1185), no

nerve entrapment was demonstrated at that time—only the possibility of such.  Moreover, as to numbness of the right hand, Plaintiff acknowledged that this had not changed since the time of his 1981 injury, approximately thirty years prior.  For these reasons the court concludes that the evidence concerning Plaintiff's right wrist is not probative of disability on or prior to the date of the ALJ's September 24, 2010, decision.

In summary, as discussed above the court concludes that none of the additional evidence Plaintiff submitted to the AC rendered the denial of benefits erroneous.  Additionally, the record reflects that the Commissioner correctly applied the law in considering Plaintiff's claim.  Accordingly, Plaintiff is not entitled to remand of this case pursuant to sentence four of § 405(g).

B.      Plaintiff's Motions to File Additional Evidence

Plaintiff also seeks to introduce another 169 pages of records, which he has submitted to the court in the form of attachments to his memorandum (doc. 32), to his four motions (docs. 35, 43, 44, 45), and to his reply to the Commissioner's response (doc. 41).[19]  The court treats these efforts to submit additional evidence as motions to remand pursuant to sentence six.

As noted above, remand to the Commissioner is warranted under sentence six when (1) new, noncumulative evidence exists; (2) the evidence is material; and (3) good cause exists for the claimant's failure to submit the evidence at the administrative level.  *See* Vega, 265 F.3d at 1218; Ingram, 496 F.3d at 1267.   Remand pursuant to sentence six encompasses only those instances in which "the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." Ingram, 496 F.3d at 1267 (quoting Sullivan v. Finkelstein, 496 U.S. 617, 626, 110 S. Ct. 2658, 2664, 110 L. Ed. 2d 563 (1990)).  The court may not remand pursuant to sentence six for reconsideration of evidence previously considered by the AC.  *Id.* at 1269.

Some of the evidence Plaintiff has submitted to the court was presented to the ALJ and/or the AC (doc. 32 at 4–14, 18, 25, 71–77, 79–81, 101–02, 106–10; doc. 41 at 8–10).  Other documents simply are not material, such as extremely remote evidence (some dates as far back as 1998, or ten

---

[19]   The documents, covering the twelve-year period between 1998 and 2012, are presented in extremely haphazard fashion, with no recognizable organization or order.

years prior to the September 2008 alleged disability onset date), evidence that is administrative in nature (doc. 32 at 24, 37–42, 49–50, 57–61, 65–66, 83–85, 112–13, 116–17, 120–25), or evidence that is cumulative, duplicative, or otherwise irrelevant (doc. 32. at 19–20, 26–31, 36, 43–48, 52–56, 62–64, 67–70, 82, 88–89, 96–100, 103–05, 114–15, 118–19; doc. 35 at 3).  None of this evidence provides any basis for remand under sentence six.

The remaining evidence was created in 2011 or 2012.  It primarily relates to Plaintiff's spinal surgery, which was performed in February 2012, and subsequent pain management and physical therapy (doc. 32 at 16–17, 21–23; doc. 35 at 4–9; doc. 43 at 5–17, 20–21, 25, 27–29; doc. 45 at 5); his seizure disorder (doc. 32 at 32–35; doc. 43 at 18–19; doc. 44 at 4–6 ); eye problems (doc. 32 at 86–87); wrist problems (doc. 32 at 90–95); and sleep therapy (doc. 43 at 22–24; doc. 45 at 3–4).

As noted, the relevant question before the court is whether Plaintiff was "entitled to benefits during a specific period of time, which period was necessarily prior to the date of the ALJ's decision." Wilson, 179 F.3d at 1279.  The court has reviewed the new evidence and concludes it shows that some of Plaintiff's conditions—in particular his spinal condition but also, to some extent, his seizure disorder, eye problems, and wrist problems—worsened after the ALJ's September 24, 2010, decision.  The court cannot conclude, however, that any such deterioration is relevant to Plaintiff's condition as it existed on or prior to the date of the ALJ's decision; in other words, the evidence is not probative of Plaintiff's disability during the relevant period. See Wilson, 179 F.3d at 1279; Wyatt v. Sec. of Health and Human Servs., 974 F.2d 680, 685 (6th Cir. 1992).  Evidence of deterioration of any previously-considered condition(s) may subsequently entitle a claimant to benefit from a new application, but it is not probative of whether the claimant was disabled during the specific period under review. See Wilson, 179 F.3d at 1279.  The new evidence from 2011 and 2012 therefore provides no basis to remand this case pursuant to sentence six.[20]

_____

[20]  Plaintiff is free to file a new application for benefits if he believes he can establish that his condition(s) worsened after the date of the ALJ's September 24, 2010, decision, resulting in his disability. Id. at 1279 n.5; Sizemore v. Sec. of Health and Human Servs., 865 F.2d 709, 712 (6th Cir. 1988).

VII.    CONCLUSION

For the foregoing reasons, the court finds the Commissioner's decision is supported by substantial evidence and comports with proper legal principles.  The decision therefore shall be affirmed pursuant to sentence four of § 405(g).  In addition, the court treats Plaintiff's requests to file additional evidence as motions to remand pursuant to sentence six of  § 405(g), which motions the court denies.

Accordingly, it is **ORDERED**:

1.    The decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g), and Plaintiff's requests to file additional evidence (docs. 35, 43, 44, 45), treated as motions to remand pursuant to sentence six of 42 U.S.C. § 405(g), are **DENIED**.

2.    This action is **DISMISSED,** and the clerk is directed to close the file.

At Pensacola, Florida this 6th day of September 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**